LODGED

1

2

**UNITED STATES DISTRICT COURT FOR THE** JUN 0 4 2025
**EASTERN DISTRICT OF CALIFORNIA**

CLERK U.S. DISTRICT COURT

3   Jamie Osuna, CDCR #BD0868        Docket No.: 1:24-cv-01156-JLT-EPG EASTERN DISTRICT OF CALIFORNIA

4   PO Box 3476                     First Amended Complaint           BY_____
    Corcoran, CA 93212                                                DEPUTY CLERK
                                    Pursuant to FRCP 15a to correct Pl.'s newly found
5   Pl.,                            defects, mistakes in the original complaint.

6            against              **DEMAND FOR JURY TRIAL**

7   T. Campbell, B. McKinney, A.   **COMPLAINT FOR DECLARATORY AND**
    Johnson, T. Sparks, D. Watson, A. **INJUNCTIVE RELIEF,**
8   Aranda, E. Moreno, S. Gates, S. **COMPENSATORY AND PUNITIVE**
    Harris, A. Aranda, A. Johnson, A. **DAMAGES**
9   Vu, E. McDaniel, M. Whittaker, C.
    Soares, et al                  Brought under 42 U.S.C. § 1983 (civil rights action) for
10          Defs.                  violations of the U.S. Constitution.

11

12                           **JURISDICTION & VENUE**

13  1. This is a civil rights action arising under 42 U.S.C. § 1983 to redress the deprivation under the

14     color of state law of rights, privileges, and immunities guaranteed by the Eighth Amdt. to the

15     U.S. Constitution, secured by acts of Congress, providing for equal rights of persons within the

16     jurisdiction of the U.S. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§

17     1331, 1343 (a)(3). This Court has jurisdiction over Pl.'s action and is empowered to grant

18     injunctive relief pursuant to Fed. R. Civ. P. 65 and may exercise supplemental jurisdiction under

19     28 U.S.C. § 1367.

20  2. Venue is proper in this judicial district, the Eastern District of California, Fresno Division,

21     pursuant to 28 U.S.C. § 1391 (a)(b) because a substantial part of the events and actions and

22     omissions giving rise to Pl.'s claims occurred at CSP-COR, California Department of

23     Corrections (CDCR), in Corcoran, CA, Kings County, which is within this judicial district.

24                              **INTRODUCTION**

25  3. Pl. is hereby filing his first amended complaint under FRCP 15a. Pl. recently observed mistakes

26     and newly found defects in his original complaint. This is a § 1983 civil rights action brought

27     by Jamie Osuna, a state prisoner, for declaratory and injunctive relief, compensatory and

28     punitive damages under 42 U.S.C. § 1983 alleging being subjected to unsafe conditions of

                                        1
                                                            *OSUNA V. CAMPBELL, ET AL*

1    confinement with/of dangerous, hazardous living conditions, denial of reasonable safety needs,

2    denial of medical care, and for deliberate indifference to Pl.'s serious medical/mental health

3    needs. These above-described unsafe conditions of confinement and deliberate indifference

4    contributed to Pl.'s significant injuries he sustained daily on his body, which injuries were

5    consistent with untreated decompensation. This lack of intervention/treatment led to injuries

6    after Pl. was left in a cell for four months with two broken windows and glass everywhere. Pl.'s

7    cell floor was soaked with blood, covered with bloody rags, other bloody debris. These above-

8    described conditions were visible to CSP-COR Defs. everyday for four months without

9    intervention/treatment, against state/CDCR protocols and policies and in violation of Pl.'s

10    Eighth Amdt. rights guaranteed under the U.S. Constitution.

11    4. Due to Pl.'s intellectual hardship of being under PC 2602 orders, schizophrenia-type mental

12    illnesses, SHU/RHU housing, Pl. received help with the transcribing/writing of this complaint.

13                                            **PARTIES**

14    5. Pl. Jamie Osuna is a state prisoner incarcerated at CSP-COR, Corcoran, CA.

15    6. Def. T. Campbell, Warden, is being sued in her individual, official capacities.

16    7. Def. B. McKinney, Associate Warden/AW, is being sued in her individual, official capacities.

17    8. Def. E. (Enrique) Moreno is a Lt. and is being sued in his individual, official capacities.

18    9. Def. T. (Tiffany) Sparks(-Mendoza) is a Mental Health Supervisor and is being sued in her

19        individual, official capacities. CA license # 77726; Board of Behavioral Sciences.

20    10. Def. S. (Scott) Harris is CSP-COR's Chief of Mental Health (CMH) and is being sued in his

21        individual, official capacities. CA license # 22416; Board of Psychology.

22    11. Def. A. (Alonzo) Aranda is a Lt. and is being sued in his individual, official capacities.

23    12. D. (Daniel) Watson is a licensed clinical social worker and is being sued in his individual,

24        official capacities. CA license # 81005; Board of Behavioral Sciences.

25    13. Def. A. (Andrew) Johnson is a Cpt. and is being sued in his individual, official capacities.

26    14. Def. A. (Alan) Vu is a medical doctor and staff psychiatrist and is being sued in his individual,

27        official capacities. CA license # 76543.

28    15. Def. S. (Sara) Gates is CDCR's Chief of medical/mental health care, based in Sacramento, CA,

2                                                              *OSUNA V. CAMPBELL, ET AL*

1    and is being sued in her individual, official capacities.

2 16. C. (Clint J.) Soares is a Chief Psychologist and is being sued in his individual, official

3    capacities. CA license # 18782; CA Board of Psychology.

4 17. Def. E. (Eric) McDaniel is CEA and is being sued in his individual, official capacities.

5 18. Def. M. (Michael) Whittaker is CSP-COR's Health Care CEO and is being sued in his

6    individual, official capacities.

7 19. Defs. (John/Jane) Does, 1-TBD, were/are CDCR personnel and are being sued in their

8    individual, official capacities.

9              **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

10 20. Pl. has exhausted his administrative remedies with respect to all claims and all Defs. CDCR

11    issued log # / health care grievance # 397422/COR-HC-23000809 for Pl.'s grievance for

12    jurisdiction of mental health/medical staff, which was exhausted at all levels in CDCR.

13                       **FACTUAL STATEMENT**

14 21. On or around 01/10/2023, Pl. was discharged from CSP-COR's Crisis Unit after an around 30-

15    day in-patient admission for Pl. displaying dangerous symptoms/side effects from PC 2602

16    forced psychotropic, antipsychotic medications. Pl. has been under continual PC 2602 orders

17    since around 2020 for serious mental illnesses, being deemed a danger to self/others and

18    gravely disabled (e.g., all the determining markers required for a PC 2602 order.)

19 22. On or around 01/10/2023, Pl. was rehoused/assigned to CSP-COR SHU/RHU.

20 23. On or around 01/15/2023, Pl. displayed mental health symptoms and was escorted to the unit

21    shower, where Pl. attempted to self-harm. Pl. was caught and was unsuccessful.

22 24. R. Esquivel (CO) escorted Pl. back to his cell. Pl. broke Pl.'s cell window; sharp glass shards

23    flew everywhere. Pl. was issued a rules violation report (RVR) log # 7260116 for this incident.

24 25. The same day, Pl. began cutting himself with glass shards from the broken window.

25 26. On or around 01/28/2023, Pl. continued to use the glass shards to cut himself. The blood all

26    over Pl.'s floor and bloody rags/debris were visible to custody and clinical staff through the

27    cell door window and cell door.

28 27. On or around 01/28/2023, Pl. was escorted to a visit. The cuts on Pl.'s legs and arms, as well

*OSUNA V. CAMPBELL, ET AL*

1      as blood and bloody rags/debris were visible to custody staff who were located by the door.

2   28. Around 11 am to 12:45 pm, F. Camacho was walking the tier when she saw Pl.'s cell door

3      open and noticed the blood.

4   29. F. Camacho stated, "Is that blood? Is anybody gonna clean this shit up?" F. Camacho then

5      called to R. Muhammed to look at the floor and the blood that was soaked over that concrete

6      floor. Pl. received no treatment and no clinical intervention.

7   30. While Pl. was at visiting, his visitor saw the cuts on Pl.'s arms and asked Pl. why they [CSP-

8      COR] had not intervened. That same day, Pl.'s visitor reported Pl.'s physical state/living

9      conditions to Rosen, Bien, Galvan, & Grunfeld, LLC (RBGG) (*Coleman* Project Team.) Pl.

10     was placed back into his cell after his visit, and Pl. cut himself with the glass shards again.

11  31. Around 01/30/2023, at his visitor's urging, Pl. filed a grievance requesting to be placed at

12     higher level of care/treatment due to decompensation/trouble managing his mental health

13     episodes and CSP-COR's mental health/other staff acting in deliberate indifference to Pl.'s

14     health and safety. Pl. with that 602 requested body camera footage from the above-described

15     incident and a 7219 medical/injury report.

16  32. Around 02/01/2023, Def. T. Sparks informed Pl. she received an email from RBGG worried

17     about Pl. after RBGG received notice Pl. was in danger. Def. asked if Pl. was cutting and to see

18     the wounds. Pl. showed his right arm with a 7-inch cut open into the muscle. Def. opened her

19     eyes wide, left, returned with a psych tech who said, "Wow" in Spanish at seeing Pl.'s arm.

20     They documented Pl.'s injuries. Def. stated that she had to find a response to the email. Pl.

21     stated he had not been receiving any medical attention for his mental health episodes, and no

22     one was addressing the hazards. Def. stated that all she had to do was come up with something

23     to walk away and make RBGG go away. Def. at other times expressed her anger at Pl.'s

24     grievances and participating in RBGG's interviews for class action Coleman v. Newsom.

25  33. Around 02/2024, Def. D. Watson approached Pl.'s cell for their weekly treatment meeting.

26  34. Pl. informed Def. that Pl. was having side effects/symptoms of Pl.'s serious mental illnesses

27     and medications. Pl. reminded Def. of the safety claimers in Pl.'s file regarding dangerous side

28     effects of his antipsychotic, psychotropic medications. Pl. stated Pl. was feeling agitated,

4                                              *OSUNA V. CAMPBELL, ET AL*

1  irritated, having insomnia, rapid muscle movement/nerve movements in the body that Pl.

2  cannot control, and continued severe grinding of teeth.

3  35. Pl. told Def. that Pl. was still blacking out and wasn't remembering a lot that was happening,

4  that when Pl. comes to consciousness, Pl. would find himself injured with glass stuck on his

5  arms and the bottoms of his feet.

6  36. Def. stated to Pl., "Well, you can learn how to change your behavior. If you come out and talk

7  [at talk therapy], it will be something."

8  37. Pl. stated to Def. these side effects are not behavioral issues that cannot be talked away, that

9  there are permanent side effects like tardive dyskinesia (involuntary muscle movement) that Pl.

10  was experiencing. Pl. stated that Pl. thought Pl. should be in a safer cell or treatment facility

11  because of the broken glass everywhere, that CSP-COR isn't equipped to keep Pl. safe and

12  unable to help Pl. manage side effects symptoms.

13  38. Def. stated that Def. "didn't agree" with Pl.'s diagnoses.

14  39. Pl. reminded Def. that CSP-COR repeatedly brings Pl. to administrative court to renew PC

15  2602 forced medication orders, for which CDCR's/CSP-COR's-appointed psychiatrists submit

16  reports that Pl.'s write ups were due to Pl.'s underlying psychotic processes.

17  40. Pl. stated, "You're forcing me with psychotropic medications but don't want to deal with or

18  acknowledge the side effects it's having on me or give me the proper treatment that comes

19  with [is required for] being petitioned for PC 2602."

20  41. Def. stated that Def. "didn't believe in side effects" or the dangers/hazards, and that there was

21  nothing Def. could do but talk to Pl.

22  42. Pl. asked Def. what about Pl.'s episodes of blacking out and the glass everywhere, blood.

23  43. Def. stated that Pl. "had to make changes." Def. stated Def. would let Def.'s supervisors know

24  about the broken window and hazards/blood everywhere, and then Def. walked away.

25  44. During Def. D. Watson's and Pl.'s following weekly-scheduled one-on-one cell-side meeting,

26  Def. informed Pl. that Def.'s supervisors wanted to leave Pl. in Pl.'s cell at Pl.'s current level

27  of treatment (the lowest level of treatment available, CCC.) Pl.'s windows/cell had continued

28  to remain in the same condition since Def.'s and Pl.'s previous meeting.

5                    *OSUNA V. CAMPBELL, ET AL*

1   45. Pl. informed Def. D. Watson that Pl. has been cutting and experiencing various mental health
2       symptoms/episodes since their last meeting.
3   46. Def. D. Watson stated, "You should come out [to talk therapy]. I'll see you next week." Def.
4       then walked away. This continued week after week.
5   47. In or around the beginning of 04/2023, Pl.'s newly assigned clinician C. Angel approached
6       Pl.'s cell. Pl.'s window was still broken, blood was everywhere in the cell, and Pl. had visible
7       injuries on Pl.'s arm.
8   48. During their discussion, Pl. informed C. Angel of Pl.'s serious mental illness diagnoses
9       (unspecified schizophrenia, psychotic disorder, mood disorder, PTSD), which a qualified
10      neuropsychologist and CDCR-top specialist determined via extensive testing on Pl. Pl.
11      informed Def. that Pl. has been under continual PC 2602 orders for involuntary medication,
12      and that from these medications Pl. was experiencing severe side effects, issues.
13  49. C. Angel stated to Pl. that yes Pl. was on antipsychotics, and Pl. was in a bad situation/harming
14      himself, but that Pl. was responsible for Pl.'s behaviors and that Pl. should admit this and that
15      Pl. needed to be punished for his crimes. Def. had Pl.'s diagnoses only as a personality
16      disorder—against CDCR's prior test results and PC 2602 petitions.
17  50. Pl. asked C. Angel why Pl. was stuck in that cell having serious side effects/symptoms with
18      blacking out and broken window glass/hazards and waking up with injuries without help, and
19      why Pl. was not allowed a higher level of treatment and kept in a safer environment.
20  51. C. Angel stated, "Well, I know, I know, but you at least, if something, can come to your one-
21      on-ones [talk therapies]."
22  52. Pl. stated that that doesn't change his unsafe living conditions. Pl. stated that treatment talk
23      therapy does not fix chemical side effects that Pl. was having, and it doesn't stop the injuries
24      that were out of Pl.'s control.
25  53. CSP-COR mental health staff had not accepted recommendations and were not following
26      CDCR/state policies guiding how to properly address symptoms like what Pl. experiences.
27      CSP-COR, without new testing and without changes in industry definitions, then
28      changed/stated Pl.'s diagnoses was only "personality disorder" enabling/justifying their

1    decisions for Pl. Conversely, the PC 2602 petitions CSP-COR filed listed another different

2    diagnosis enabled the PC 2602 order.

3    54. C. Angel stated she would inform Def. A. Johnson about the broken window, but that there's

4    nothing she could otherwise do.

5    55. After this meeting, Pl. continued to have/exhibit symptoms and side effects and continued to

6    wake up with injuries on his body and glass stuck to him.

7    56. The next week, C. Angel told Pl. Defs. A. Johnson, AW and higher ups did not want to move

8    Pl. to a safer location.

9    57. In or around 04/2023, Pl.'s treating psychiatrist Def. Dr. Vu. approached Pl.'s cell via

10    telepsychiatry. (e.g., Dr. Vu's assistant came to Pl.'s cell and held up a laptop with a speaker

11    for Pl. and Def. to remotely discuss Pl.'s mental health through the cell door over the laptop.)

12    Def. Dr. Vu asked through this laptop how Pl. was doing.

13    58. Pl. asked Def. whether Pl. could be taken off PC 2602 because Pl. had been compliant with

14    and never refused his medication and had been having side effects—including irreversible

15    tardive dyskinesia, self-harming/desire to self harm, having blackouts where Pl. wakes up

16    afterward with injuries. Def. Dr. Vu stated, "Well, you should come out and talk [at talk

17    therapy sessions]. There's nothing I can do since you didn't come out." Dr. Vu then stated,

18    "I'll see you next time." Pl. received no treatment or intervention for Pl.'s physical injuries,

19    self-injurious behavior and side effects.

20    59. During Pl.'s next telepsychiatry appointment with Def. Dr. Vu, Pl. explained to Def. that Pl.

21    had to go to suicide watch because of side effects, that Pl. hadn't been feeling well. Def. Vu

22    asked how Pl. was feeling then. Pl. stated, "I'm having insomnia and rapid muscle, face

23    movements and grinding of teeth, constipation, pain in my stomach, induced psychosis,

24    blackouts, and I've been self injuring. Some injuries I don't remember doing." Def. Vu stated,

25    "I hope you do well. I'll see you next week." Pl. received no treatment or medical intervention.

26    60. On or around 03/20/2023, Pl. interviewed with L. Lulow for a grievance. At that time, L.

27    Lulow stated to Pl. that in his [qualified] opinion, Pl. needed a higher level of care, more

28    intensive mental health treatment. L. Lulow stated he was disappointed in L. Lulow's

1    supervisors. L. Lulow stated his supervisor Def. T. Sparks had stated to mental health staff that

2    Def. T. Sparks would not help Pl. because Def. T. Sparks thought Pl. was "evil" and that "you

3    can't cure evil." Def. had told Pl. and that Pl. should be punished for his crimes. L. Lulow

4    stated he didn't realize his supervisors were like that, that he was disappointed in such

5    medieval thinking, and that L. Lulow couldn't believe these supervisors were allowing Pl. to

6    stay in a dark, damp cell, alone, and known as harming himself and decompensating. L. Lulow

7    stated that out of all people, Pl. didn't belong there.

8    61. Against L. Lulow's recommendations, Pl. did not receive more intensive treatment. Pl.

9    received no safety/security regarding the broken window/shards and self-harm.

10   62. Around 02/2023-05/2025, meetings were held to raise Pl.'s level of care and brought to the

11   attention of Defs. S. Gates, E. McDaniel, C. Soares, S. Harris that they wanted to raise or had

12   raised Pl.'s level of care. Pl. was harming self/others and COs (Torres, Resendes, Balanga)

13   filed 128-B Chronos stating Pl. was self-harming all of the time and had blood everywhere and

14   was exhibiting bizarre, unusual behavior. Defs. S. Gates, E. McDaniel, C. Soares, S. Harris had

15   stated to Pl.'s clinician and Treatment Team that Pl. was to stay in that unit and cell, excluded

16   from treatment programs. The then notified Pl. that Defs., supervisors said that no, Pl. could

17   not be moved and was excluded from treatment.

18   63. Pl. broke the other cell window and began using the bigger shards of glass to self-mutilate

19   without intervention.

20   64. On or around 04/20/2023, unit officers Resendes, Ayala and RN Waite completed a 7219

21   medical/injury form on Pl.

22   65. On or around 04/28/2023, an incident occurred from Pl. having symptoms and side effects. Pl.

23   received a write-up/RVR over the incident. Pl.'s arms were cut up at that time. A unit sgt.

24   approached with RN Jane Doe. They asked Pl. if Pl. had any injuries and whether those

25   injuries were from that same day. Pl. stated Pl.'s injuries were "from everyday going back

26   from yesterday." Pl. was in and out of blackouts when they were asking Pl. questions. Pl.

27   informed the sgt. that Pl. had not received mental health help/treatment and that Pl. had cuts to

28   the bottoms of Pl.'s feet and should be moved to a safer cell. Pl.'s injuries were documented.

*OSUNA V. CAMPBELL, ET AL*

1    No further medical treatment or evaluations were given to Pl.

2    66. On or around 05/05/2023, Pl. stayed up all night cutting on himself.

3    67. On third watch, Pl. had a scheduled visit. Pl. was escorted to his visit with visible fresh

4    wounds, and blood in/around his cell, which Def. Does, mental health and other prison staff

5    during their multiple daily rounds and general duties around/with Pl. had seen but, against

6    CDCR/State protocols/policies, had not intervened.

7    68. While Pl. was at visiting, Pl.'s visitor noticed the cuts on his arms. Again, Pl. responded that

8    they [CSP-COR] were not concerned/didn't care and didn't intervene, that the unit sgt. stated

9    that the warden wanted/required Pl. to be in that specific cell because of how the cell is

10    designed. Even when staff acknowledged this had put and was putting Pl. in harm's way and

11    contributing to Pl.'s injuries, that's how they [Warden and management] wanted it.

12    69. After the visit, Pl. was escorted back to his cell with the same broken window, bloody

13    rags/debris on the floor. Pl. began cutting again and had active, noticeable bleeding.

14    70. The same day, Pl.'s visitor contacted RBGG informing them of what she had seen at the visit,

15    expressing her concerns at how CSP-COR was not managing Pl.'s mental health episodes.

16    71. On that same day, RBGG contacted CSP-COR about Pl. and their concerns, and about the

17    phone call they received from Pl.'s loved one.

18    72. Around 5 pm, because of RBGG's contact, Def. E. Moreno approached Pl.'s cell. Def. stated

19    to Pl. that since there were no clinicians at CSP-COR after 4 pm there was no one to evaluate

20    and clear the Pl., and that because of this Pl. had to be placed in the Crisis Unit until the

21    morning when Pl. would come back to Pl.'s cell.

22    73. Def. E. Moreno asked if Pl. was bleeding. Pl. lifted his arm and showed Def. active bleeding

23    from gashes in Pl.'s right arm. Def. E. Moreno asked Pl., "How long have you had the two

24    broken windows?" and Pl. stated, "For around four months."

25    74. Def. Moreno stated that Pl.'s cell should have been red lined, tagged, closed off. Pl. stated that

26    he had been cutting himself with glass for months and no one addressed the issue, that when he

27    came out for visit no one cared that Pl. had blood everywhere, bloody rags.

28    75. Def. E. Moreno stated to Pl. that Pl.'s "friend needed to be careful what that friend says

9                                              *OSUNA V. CAMPBELL, ET AL*

1    because when/if suicide is mentioned they [CSP-COR] are forced to act." The actual policy is

2    that upon any staff becoming aware/being put on notice of an inmate self-harming, that staff

3    must stand post until clinical intervention presents to perform an evaluation. It was only being

4    addressed now because RBGG had contacted CSP-COR. Pl. had previous grievances on Def.

5    and when confront on the yard by Pl./inmate over the matters described in those grievances,

6    Def. had stated that it was just "strictly business" and that he wasn't going to apologize.

7    76. Def. A. Aranda refused Pl.'s request to move to another cell.

8    77. Def. E. Moreno stated to Pl., "For now you have to go to Crisis. We're going to pull you out

9    and Torres and Muhammad while you're gone will clean up your cell and I promise you'll be

10    out by the morning."

11    78. Pl. then agreed and grabbed a piece of ripped sheet and tied off his arm to stop the bleeding.

12    79. Pl. was escorted to the Crisis Unit where Pl. was checked out at the Treatment Triage Area.

13    80. Def. Doe (RN) looked at Pl.'s wound, refused to clean it, stated, "Let suicide watch deal with

14    it." Pl.'s arm was dripping with blood on the bed. The escorting unit officer stated to Def. Doe,

15    "[Pl.] is bleeding. There's blood getting everywhere. Aren't you going to clean it?"

16    81. Def. Doe stated, "Let them do it. He may not be able to have the wrapping back there."

17    82. Def. E. Moreno told Pl. that the AW said, "You'll be discharged out by the morning."

18    83. The escorting unit officer stated to Pl., "They're always just sending you back and you

19    continue to do the same thing. I don't understand."

20    84. Pl. was placed in Crisis Unit for around thirteen hours and discharged the next morning.

21    85. Pl. was then placed back in the same cell with the broken windows, with bloody toilet paper

22    rolls, bloody, ripped up towels, inter alia, still on the floor.

23    86. During that same day, Pl. began to decompensate and used the glass shards to cut himself

24    again without further treatment or intervention.

**CAUSES OF ACTION**
25    **CLAIM ONE: EIGHTH AMDT. TO THE U.S. CONSTIT.; CONDITIONS OF**
26    **CONFINEMENT**

27    87. The actions/omissions of Def. A. Aranda (Lt.) failed to result in the immediate closing off of

28    Pl.'s cell and failed to result in an order for Pl.'s cell windows to be fixed for around four

*OSUNA V. CAMPBELL, ET AL*

1    months. Def. failed to remove Pl. from the substantial risk when Def. was put on daily notice

2    of incidents/injuries Pl. was suffering from the hazard of broken glass shards. Additionally,

3    Def. was one of the supervisors who ordered Pl. not be moved for any reason from this cell.

4    The actions and omissions of Def. A. Aranda demonstrated deliberate indifference, had

5    constituted unsafe conditions of confinement, and violated Pl.'s right to be free of cruel and

6    unusual punishment guaranteed under the Eighth Amdt. to the U.S. Constitution. Pl. has

7    suffered, is suffering, and will continue to suffer irreparable harm, risk, and injuries/damages.

8    As a proximate result of the Def.'s violations of Pl.'s right to be free from cruel and unusual

9    punishment, Pl. suffered the above-described injuries/damages while in CSP-COR.

10   88. The actions and omissions of Def. warden T. Campbell, in failing to provide reasonable safe

11   conditions of confinement, safe living conditions of confinement, and ordering the unsafe

12   living conditions against the Pl., who has a serious mental illness and disabilities, in

13   segregation. Def. acted maliciously and sadistically for the very purpose of causing harm to Pl.

14   Def. upheld very severe restrictions imposed on Pl. who was in a disciplinary segregation unit

15   at a special sanction designated to alter his extremely dangerous, deranged conduct from

16   serious mental illness symptoms, causing Pl. an unnecessary and wanton infliction of pain and

17   physical injuries. Def. T. Campbell was informed weekly when she would be in the unit

18   running ICC by officers about Pl.'s repeated, consistent injuries he suffered on a daily basis

19   and how the window was contributing to the injuries and the Pl. should be moved. Def.

20   ignored these recommendations and stated the cell was a specially made assigned cell for Pl.

21   and that Pl. had to stay there. Def. refused to red line the cell and fix the window. Def. was

22   made aware daily that the Pl. had blood all over his cell floor, caking/stacking up and

23   unsanitary rags and toilet paper rolls and that the Pl. had injuries. Def. refused to provide

24   treatment even in a medical emergency response, such as self-injurious behavior. For the

25   majority of the four months, Pl. did not receive treatment for around 95% of those four months

26   and continued with new self-injuries every day without treatment or any intervention. Def.

27   continued to state that Pl. has to stay in isolation, in extreme isolative conditions of

28   confinement, and that Pl. was excluded from higher levels of care treatment and would stay in

*OSUNA V. CAMPBELL, ET AL*

1    Ad-Seg for being a danger to self/others, and gravely disabled and lacking capacity. Def. was

2    aware of Pl.'s serious mental illness and aware of the PC 2602 order and its side effects and

3    symptoms of mental illnesses and his treatment to refrain from compulsory self-harm and that

4    by leaving the Pl. in the cell, that the likelihood that the Pl. would continue to receive injuries

5    was high/likely and which he did. Def. took no action for all the months to make safe, sanitary

6    living quarters for Pl. and others. Def. denied Pl. basic human needs, such as sanitation,

7    personal safety, safe conditions, and medical care. Def. singles Pl. out from other inmates and

8    dictates the outcome of Pl.'s medical and mental health treatment. Def. left the Pl. for weeks in

9    puddles of blood with severe physical injuries and supported other Defs. to not provide any

10   treatment to Pl. but was/were providing treatment to other inmates. The physical injuries Pl.

11   suffered were due to the actions and omissions of Def. and due to Pl.'s injuries not being

12   treated, it has caused Pl. severe pain, and suffering, who had to close his own wounds after

13   injuring himself. The actions of Def. violated Pl.'s Eighth Amdt. Constitutional rights, causing

14   physical injuries and unnecessary and wanton infliction of severe pain.

15   89. The actions/omissions of Def. B. McKinney failed to result in providing Pl. reasonable safety,

16   which as Associate Warden was her mandatory duty to provide. Def. allowed/ordered Pl.'s

17   unsafe conditions of confinement. Additionally, on 05/05/2023, Def. pre-determined and

18   ordered to/through Def. E. Moreno that Pl. be discharged from Crisis Unit the next morning

19   and returned to Pl.'s hazardous cell. The next morning, Pl. was discharged from Crisis Unit

20   and Pl. was returned to the hazardous, bloodied cell that still had two broken windows. Def. B.

21   McKinney, since around 01/15/2023, was consistently put on notice of the injuries of and

22   hazards posed to Pl. Def. continued to take no action for four months. Even upon the order of a

23   unit CO to keep Pl. on suicide watch and move Pl. to another cell, Def. still failed to take

24   action. The actions/omissions of Def. B. McKinney resulted in Pl. remaining in inhumane,

25   hazardous conditions for four months with broken glass everywhere, bloody debris. The

26   actions/omissions of Def. B. McKinney resulted in Pl. being in continuous pain and caused the

27   consistent back-to-back incidents of injuries, and nerve damage with overall loss of feeling in

28   Pl.'s right arm and shooting pains to fingertips and keloid (raised/bulging) scarring. Pl. has

                                              12                    *OSUNA V. CAMPBELL, ET AL*

1    suffered, is suffering, and will continue to suffer irreparable harm, risk, and injuries/damages.

2    Def.'s actions/omissions constituted unsafe conditions of confinement and violated Pl.'s right

3    to be free of cruel and unusual punishment guaranteed under the Eighth Amdt. to the U.S.

4    Constitution. As a proximate result of Def.'s violations of Pl.'s right to be free from cruel and

5    unusual punishment, Pl. suffered the above-described injuries/damages while in CSP-COR.

6    90. The actions, omissions of Def. E. Moreno, in creating unsafe conditions of confinement, and

7    failing to take action to known risk and harm against the Pl., practiced customs and departed

8    from professional, mandated protocols and procedures that are in place to keep the safe

9    custody of inmates. Def. failed on 05/05/2023 to redline and close down Pl.' s cell when Pl.

10    was escorted to Crisis Unit. Other officers, such as Torres, Muhammed, cleaned some of the

11    blood up, but the Def. still allowed afterwards for Pl.'s cell to be open and allowed Pl. to return

12    to the same location, in which Pl. suffered further physical injuries and unnecessary, wanton

13    infliction of pain. Def. departed from normal policy and procedure that mandates when certain

14    items are broken in cells, such as the toilet, mechanical door, and especially broken windows

15    that block observation of custody and inmates, and due to the shards of glass causing harm,

16    that these cells must be closed down for repair. Def., before the incident, acted maliciously and

17    sadistically against the Pl. for the very purpose of causing harm and threatened the Pl.'s life

18    and has told the Pl. that he's not going to apologize that it's "strictly business," and Pl. has past

19    complaints of staff misconduct against the Def. Def. was aware of the unsanitary and unsafe

20    conditions that were a threat not only to Pl. but also to correctional officers, other personnel.

21    Def.'s actions in allowing Pl. to return to the cell contributed to further physical injury and

22    unnecessary, wanton infliction of pain that resulted in the overall loss of feeling in Pl.'s right

23    arm, shooting sharp pains to fingertips and numbness of Pl.'s fingertips, and extreme scarring.

24    Def. knew that due to Pl.'s severe mental illness and PC 2602 order that at times Pl. is unable

25    to make his needs met because of psychosis, other symptoms where the Pl. blacks out or

26    hallucinates and harms himself/others.

27    91. The actions and omissions of Def. T. Sparks in creating, ordering the practices and customs

28    departing from CDCR professional procedures and protocols against the Pl., creating unsafe

1    living conditions of confinement and acting maliciously and sadistically for the very purpose

2    of causing harm to Pl., and upholding very severe restrictions imposed on Pl. who was in a

3    disciplinary segregation unit as a special sanction designated to alter the extremely dangerous

4    conduct from symptoms of Pl.'s serious mental illness and side effects from PC 2602, led to

5    significant physical injuries and unnecessary, wanton infliction of pain. The Def. has expressed

6    that the Pl. was "evil" and "couldn't be cured" and what's the point in sending Pl. to a higher

7    level of care if he's not just going to be come out anyways. Def. was made aware by RBGG that

8    Def. had to respond to Pl.'s cell and provide treatment due to the medical emergency of

9    inflicted injuries and other emergency response health conditions. Def. approached Pl.'s cell

10   with a Psych Tech and asked to see Pl.'s injuries and when Pl. lifted up his arms, the Psych

11   Tech stated, "Wow" in Spanish and expressed how bad it was, a large gash, deep in the middle

12   of Pl.'s arm around several inches long. Def. and the Psych Tech walked away, violating

13   protocol. Def. stated that she had an email from RBGG and that, "I need a reason to walk

14   away." Def. told Pl. to promise not to self-harm anymore. Def. did not have officers pull Pl.

15   out to retrieve the cutting instrument nor were the Pl.'s injuries cleaned or treated by medical

16   staff. Pl. was left to try to treat his own injuries and avoid infection. The actions and omissions

17   of Def. resulted in Pl.'s further injuries. The Def.'s decisions were so grossly incompetent,

18   inadequate, and excessive as to shock the conscious and to be intolerable to the fundamental

19   fairness. Def. denied Pl. access to treatment. Def. knew that the Pl. met the qualifications for

20   more intense treatment at a higher level of care, even at the acute level of care, so the Pl. could

21   be stabilized, and the Pl. and others could be safe. Def. ignored the mental health delivery

22   system guidelines, and ignored the adequate, modern science and has even denied that side

23   effects exist and has failed to meet the health care standards that are mandated and reasonably

24   designed to meet the routine and emergency medical, dental, and psychological or psychiatric

25   care. Def.'s actions, omissions created unsafe conditions of confinement and caused significant

26   injury, unnecessary, wanton infliction of pain, was grossly inadequate psychiatric care, and

27   violated Pl.'s Eighth Amdt. rights.

28   92. The actions/omissions of Def. A. Johnson, after Def. was put on notice of the broken cell

windows and that Pl. was sustaining injuries from broken glass, failed to result in ordering

Pl.'s cell closed off and fixed for around four months. Def. failed to remove Pl. out of the

substantial risk, which failure ensured Pl. continued to sustain injuries. Def., as the building's

captain, was consistently present within the unit and reasonably aware of the state/conditions

of that building and its inmates, was reasonably aware of the blood all over Pl.'s cell, and Pl.'s

in-cell conditions that was hazardous both to Def.'s staff and Pl. Def. failed to provide or

summon a hazmat cleaning team and had denied Pl. basic cleaning necessities. Def. was on

notice of Pl.'s diagnoses of serious mental illnesses because Def. participates in and is a main

decision maker in Pl.'s monthly IDTT/treatment committee meetings. One purpose of these

IDTT meetings is reviewing Pl.'s housing assignment and incidents/occurrences. Def. at every

opportunity failed to take adequate action and failed to direct orders to his staff under his

charge to take adequate action. Additionally, Def. tolerated inadequate mental health treatment

by CSP-COR's mental health staff. Unit officers J. Munoz, I. Torres, Resendes, and Balanga

wrote/submitted 128-D Chronos in documenting Pl.'s state/living conditions and how these

unit officers tried to address the above-described/omitted incidents. These officers'

supervisors, including Def. A. Johnson, instead of following State/CDCR protocols/polices

had overridden these officers' decisions/recommendations to provide adequate treatment/care

to/for Pl., which these officers then reported this to Pl. These officers' 128-D Chronos clearly

established Pl.'s behaviors and injuries and how these officers tried addressing it. Def. A.

Johnson, as unit captain, was on notice of such 128-D Chronos and or had direct access to

these documents. The actions/omissions of Def. A. Johnson resulted in Pl. remaining in

inhumane, hazardous conditions for four months with broken glass everywhere, bloody debris.

It resulted in Pl. remaining in continuous pain, had caused the consistent back-to-back

incidents of injuries, and nerve damage with overall loss of feeling in Pl.'s right arm and

shooting pains to fingertips and keloid (raised/bulging) scarring. Pl. has suffered, is suffering,

and will continue to suffer irreparable harm, risk, and injury/damage. Def. A Johnson's

actions/omissions constituted unsafe conditions of confinement and violated Pl.'s right to be

free of cruel and unusual punishment guaranteed under the Eighth Amdt. to the U.S.

*OSUNA V. CAMPBELL, ET AL*

1    Constitution. As a proximate result of Def.'s violations of Pl.'s right to be free from cruel and

2    unusual punishment, Pl. suffered the above-described injuries/damages while in CSP-COR.

3    93. The actions and omissions of Def. Does, in participating and ordering the practices and

4    customs departing from normal procedures, acted maliciously, sadistically with the very

5    purpose of causing Pl. harm to uphold very severe restrictions imposed on Pl. who was in a

6    disciplinary segregation unit as a special sanctioned design to alter his extremely dangerous

7    conduct due to severe mental health symptoms, as a danger to self/others, gravely disabled,

8    lacks capacity. Def. Does, in creating practices and customs that do not support staff in

9    responding to emergency situations and threats to self-injure, self-harm, and dangerous side

10   effects to medications such as seizures, onset of stroke, numbness to the left arm/face, suicidal

11   ideation, and the current observable physical injuries, created conditions of unsanitary living

12   conditions, had allowed weeks and weeks of bloodied debris and dried blood to be all over the

13   tier and doors and floor and had not responded to Pl.'s emergency medical needs and injuries

14   when made aware and had not red-lined the cell and moved Pl. to a safer location. The actions,

15   omissions of Def. Does constituted unsafe conditions of confinement and were deliberate

16   indifference for knowing the known risk and imminent danger and harm that Pl. was in and

17   failed to take any action to provide safe custody for Pl. and created an environment that made

18   Pl.'s conditions and injuries worse, causing unnecessary, wanton infliction of pain and

19   suffering, violating Pl.'s Eighth Amdt.

20   **CLAIM TWO: EIGHTH AMDT. TO THE U.S. CONSTIT.; DELIBERATE
INDIFFERENCE TO SERIOUS MENTAL HEALTH/MEDICAL NEEDS**

21   94. The actions and omissions of Def. T. Sparks, in acting with deliberate indifference to Pl.'s

22   serious mental health medical needs, knew of and disregarded an excessive risk of serious

23   harm to inmates' health and safety and failed to carry out psychotropic medical orders. Def.

24   was made aware weekly by staff and by personal observation of Pl.'s physical injuries and

25   symptoms every day and allowed Pl. to stay in the cell with a cutting instrument and failed to

26   order Pl. to receive medical treatment and secure the instrument. Def. was made aware by COs

27   who worried of the living conditions and health of Pl., Pl.'s mental health, and that Pl. had

28

16                                          *OSUNA V. CAMPBELL, ET AL*

1  layers of fresh blood stacked on the floor with a lot of flies, roaches, bloody towels, toilet

2  paper rolls, content, and of two broken windows, and that Pl. was being injured from the glass.

3  Pl. expressed his symptoms and side effects that lead to injuries. Def. refused to treat Pl. due to

4  her belief that Pl. was "evil" and "evil can't be cured" and due to her anger about Pl.'s

5  complaints against them, and RBGG's class actions against mental health that Pl. gave

6  statements for. Def. failed to carry out CDCR-petitioned medical orders for a psychotropic

7  medical. Def. failed to act on medical recommendations by order from a petitioned

8  administrative judge for CDCR who also ordered that Pl. must be monitored on periodic basis

9  to determine if the drugs 1.) were causing any harmful side effects 2) if the drugs were

10  working the way the psychiatrist intends for it to work. Def. knows <u>Coleman v. Wilson,</u>

11  <u>Coleman v. Newsom</u> court orders, and that adequate prison mental health care requires

12  administration of psychotropic medications only with supervision and periodic evaluation. Def.

13  has a Constitutional duty to adequately monitor inmates' prescription psychotropic medication

14  whether they require such monitoring or not. Def. was aware of the facts which was detailed

15  information about the danger Pl. was in which the inference was drawn that a substantial risk

16  of serious harm existed and Def. failed to embrace a policy or take other reasonable steps

17  which could have prevented the harm and continued harm. Def.'s actions resulted in Pl.

18  suffering unnecessary, wanton infliction of pain and physical injuries, deeply cut up arms, legs,

19  feet which out of all four months had not received treatment once, leaving Pl. with numbness

20  in fingertips, shooting pain down through his hands, inter alia. Def.'s actions constituted

21  deliberate indifference to serious mental health medical needs, was grossly inadequate

22  psychiatric care, and violated Pl.'s Eighth. Amdt. rights.

23  95. The actions and omissions of Def. D. Watson in acting with deliberate indifference to Pl.'s

24  serious mental health medical needs, knew of and disregarded an excessive risk of serious

25  harm to Pl.'s health and safety, and failed to carry out medical orders of a psychotropic

26  medical petition. When Def. approached Pl.'s cell for their weekly one-on-ones which Pl.

27  would not attend due to his decompensated state, Pl. told, informed Def. that he had been

28  cutting on himself, having blackouts and having side effects and symptoms to psychotropic

17

<em>OSUNA V. CAMPBELL, ET AL</em>

1    medications. Pl. stated, and Def. observed Pl.'s injuries with active bleeding, and the

2    unsanitary living conditions of Pl.'s cell with layers of blood, bloody contents. Pl. informed

3    Def. that Pl. was cutting with glass from the window and a cutting instrument and that

4    sometimes Pl. would blackout and wake up and have injuries. The Def. would just walk away,

5    stating, "Okay, see you next week." Pl. received no treatment for his injuries and continued to

6    suffer injuries. Def. failed to carry out CDCR petition medical orders for psychotropic medical

7    and failed to act on medical recommendations by order from a petition administrative judge for

8    CDCR who ordered that Pl. must be monitored on periodic basis to determine if the drugs 1.)

9    were causing any harmful side effects; and, 2) if the drugs were working the way the

10   psychiatrist intends for it to work. Def. knows <u>Coelman v. Wilson,</u> <u>Coleman v. Newsom</u> court

11   orders that adequate prison mental health care requires administration of psychotropic

12   medications only with supervision and periodic evaluation. Def. has a Constitutional duty to

13   adequately monitor inmates on prescription psychotropic medication whether they request such

14   monitoring or not. Def. was aware of the facts which were detailed information about the

15   danger Pl. was in, which the inference was drawn that a substantial risk of serious harm existed

16   and Def. failed to embrace a policy or take other reasonable steps which should have prevented

17   the harm and continued harm. Def.'s actions resulted in Pl. suffering unnecessary, wanton

18   infliction of pain, physical injuries, deeply cut up arms, legs, feet, which out of all four months

19   had no treatment even once, leaving Pl. with numbness in fingertips, shooting pain down

20   through his hands. Def.'s actions constituted deliberate indifference to serious mental health

21   medical need, was grossly inadequate psychiatric care, violated Pl.'s Eighth. Amdt. rights.

22   96. The actions and omissions of Def. S. Harris, in acting with deliberate indifference to Pl.'s

23   serious mental health medical needs, knew of and disregarded an excessive risk of serious

24   harm to Pl.'s health and safety. Def. intentionally intervened with the treatment prescribed, and

25   denied Pl. access to treatment, and failed to carry out medical orders, and failed to act on

26   medical recommendations that he forced the petitioning psychiatrist to force on Pl. The Def.

27   was made aware weekly that Pl. was cutting on himself, was having symptoms and side effects

28   and had bizarre, unusual, deranged behaviors, that his clinician stated in meeting that Pl.'s

1   ADLs were not being met, Pl. was not coming out of his cell due to paranoia, and that it was

2   ordered due to Pl.'s/others' safety that Pl. needed higher level of care. L. Lulow granted a

3   health care grievance stating that Pl. needed a higher level of care that would restore Pl. to

4   stability, normalcy. Def. reviewed and decided grievances against himself and intervened on

5   both occasions, ordering L. Lulow to change his grievance findings. Def. then later somehow

6   cancelled Pl.'s bed move and transfer, and clinician C. Angel told Pl. that her supervisors got

7   in the way. This shocked COs because officers were being harmed in the process. Def. stated,

8   agreed that Pl. was evil and that evil cannot be cured and what's the point if Pl. is not going to

9   come out anyways. Right after Def. intervened, Def. then ordered Pl. to stay in the same cell

10  with broken windows. Pl. then suffered more injuries and continued to suffer side effects and

11  symptoms that led to more physical injuries. Def. failed to carry out CDCR petition medical

12  orders for psychotropic medical and failed to act on medical recommendations by orders from

13  a petition administrative judge for CDCR who ordered that Pl. must be monitored on periodic

14  basis to determine if the drugs 1.) were causing any harmful side effects; and , 2) if the drugs

15  were working the way the psychiatrist intends for it to work. Def. knows <u>Coelman v. Wilson,</u>

16  <u>Coleman v. Newsom</u> court orders that adequate prison mental health care requires that

17  administration of psychotropic medications is only with supervision and periodic evaluation.

18  Def. has a Constitutional duty to adequate monitor inmates on prescription psychotropic

19  medication whether they request such monitoring or not. Def. was aware of the facts which

20  was detailed information about the danger Pl. was in which the inference was drawn that a

21  substantial risk of serious harm existed and Def. failed to embrace a policy or take other

22  reasonable steps, which should have prevented the harm and continued harm. Def.'s actions

23  resulted in Pl. suffering unnecessary, wanton infliction of pain and physical injuries, deeply cut

24  up arms, legs, feet, which out of all four months had no treatment even once, leaving Pl. with

25  numbness in fingertips, shooting pain down through his hands. Def.'s actions constituted

26  deliberate indifference to serious mental health medical need, was grossly inadequate

27  psychiatric care and violated Pl.'s Eighth. Amdt. rights.

28  97. The actions and omissions of Def. S. Gates, in acting with deliberate indifference to Pl.'s

19                                          *OSUNA V. CAMPBELL, ET AL*

1   serious mental health medical needs, knew of and disregarded an excessive risk of serious

2   harm to Pl.'s health and safety. Def. intentionally intervened with the treatment prescribed, and

3   denied Pl. access to treatment, and failed to carry out medical orders, and failed to act on

4   medical recommendations that he forced the petitioning psychiatrist to force on Pl. The Def.

5   was made aware weekly that Pl. was cutting on himself, was having symptoms and side effects

6   and had bizarre, unusual, deranged behaviors, that his clinician stated in meeting that Pl.'s

7   ADLs were not being met, Pl. was not coming out of his cell due to paranoia, and that it was

8   ordered due to Pl.'s/others' safety that Pl. needed higher level of care. L. Lulow granted a

9   health care grievance stating that Pl. needed a higher level of care that would restore Pl. to

10  stability, normalcy. Def. reviewed and decided grievances against herself and intervened on

11  both occasions, ordering L. Lulow to change his grievance findings. Def. then later somehow

12  cancelled Pl.'s bed move and transfer, and clinician C. Angel told Pl. that her supervisors got

13  in the way. This shocked COs because officers were being harmed in the process. Def. stated,

14  agreed that Pl. was evil and that evil cannot be cured and what's the point if Pl. is not going to

15  come out anyways. Right after Def. intervened, Def. then ordered Pl. to stay in the same cell

16  with broken windows. Pl. then suffered more injuries and continued to suffer side effects and

17  symptoms that led to more physical injuries. Def. failed to carry out CDCR petition medical

18  orders for psychotropic medical and failed to act on medical recommendations by orders from

19  a petition administrative judge for CDCR who ordered that Pl. must be monitored on periodic

20  basis to determine if the drugs 1.) were causing any harmful side effects; and , 2) if the drugs

21  were working the way the psychiatrist intends for it to work. Def. knows <u>Coelman v. Wilson</u>,

22  <u>Coleman v. Newsom</u> court orders that adequate prison mental health care requires that

23  administration of psychotropic medications is only with supervision and periodic evaluation.

24  Def. has a Constitutional duty to adequate monitor inmates on prescription psychotropic

25  medication whether they request such monitoring or not. Def. was aware of the facts which

26  was detailed information about the danger Pl. was in which the inference was drawn that a

27  substantial risk of serious harm existed and Def. failed to embrace a policy or take other

28  reasonable steps, which should have prevented the harm and continued harm. Def.'s actions

*OSUNA V. CAMPBELL, ET AL*

1    resulted in Pl. suffering unnecessary, wanton infliction of pain and physical injuries, deeply cut

2    up arms, legs, feet, which out of all four months had no treatment even once, leaving Pl. with

3    numbness in fingertips, shooting pain down through his hands. Def.'s actions constituted

4    deliberate indifference to serious mental health medical need, was grossly inadequate

5    psychiatric care and violated Pl.'s Eighth. Amdt. rights.

6    98. The actions/omissions of Def. Dr. Vu, in acting with deliberate indifference to Pl.'s serious

7    mental health medical needs, knew of and disregarded excessive risk of serious harm to Pl.'s

8    health and safety, refusing to respond to serious physical injuries, an emergency response to

9    life-threatening psychotropic medical side effects, threats of self-harm, failed to carry out

10    medical orders, psychotropic medical orders, CDCR petition administrative judge court orders.

11    Def. Vu, a psychiatrist doctor, when approaching Pl.'s cell every other week, was informed by

12    Pl. that Pl. was self-harming and had physical, deep-cut wounds and active bleeding, new

13    injuries minutes before Def. approached his cell and that Pl. had been having side effects to

14    psychotropic medication and blackouts. Def. walked away, failed to inform staff of the security

15    emergency, medical emergency that Pl. had a cutting instrument in his cell that needed to be

16    secured. Def. failed to observe Pl. until staff and medical arrived, which is a mandatory

17    emergency response under the court order of Coleman v. Newsom and is a medical emergency.

18    When inmates under PC 2602 state they are having side effects, they must be sent to the

19    hospital/medical. When Def. walked away, Pl. continued to receive injuries from the broken

20    window glass and to have symptoms and side effects untreated. Def. was aware of facts from

21    which he could draw inference with the information that Pl. provided to him that a substantial

22    risk of serious harm existed. Def. failed to embrace policy or take any other reasonable steps

23    which could have prevented harm. Def. has a Constitutional duty to adequately monitor

24    inmates on prescribed psychotropic medicals whether they request such monitoring or not. All

25    inmate patients on psychotropic medicals must be monitored on periodic basis to determine if

26    the drugs give harmful side effects or if the drug is working the way the doctor intended for it

27    to work. Def.'s actions were grossly inadequate psychiatric care and violated Pl.'s Eighth

28    Amdt. rights.

*OSUNA V. CAMPBELL, ET AL*

1  99. The actions and omissions of Def. E. McDaniel, in creating unsafe conditions of confinement,

2      in making decisions against Pl., putting Pl. in substantial harm to his health and safety and not

3      taking action when being put on notice that Pl. had two broken windows, and was cut up by the

4      glass, and was having mental health symptoms from his mental illnesses where Pl. would self-

5      harm, Def. chose to keep Pl. in extreme isolative conditions of confinement, separated from

6      ordinary care of others to exasperate Pl.'s dangerous conditions due to mental illnesses

7      symptoms. Def. on multiple occasions and meetings when Pl.'s level of care was raised for Pl.

8      to be shipped out, Def. had another meeting, separately, and ordered that Pl. was excluded

9      from higher levels of care and was not allowed. Def. on multiple occasions, when overturning

10     transfers, stated Pl. was excluded. Pl. was informed by his clinician and Treatment Team that

11     Def. had it in file that Pl. was not allowed to access treatment programs. Def. expressed, agreed

12     that Pl. was evil and evil cannot be cured and that Pl. should be punished for his crimes. When

13     Def. was put on notice of Pl.'s injuries, Def. ordered Pl. to stay in that mental health unit cell

14     and Pl. continued to suffer injuries after Def.'s order. Def.'s actions resulted in Pl. to further

15     receive deep cut wounds, shooting pains, numbness, side effects and symptoms untreated, left

16     with the two broken windows, falling on his head with seizures going untreated, and other side

17     effects. Pl. suffered day-to-day for 4 months and further decompensated. Def. admitted Pl. was

18     self-harming daily and decompensating, stating Pl. was a danger to self/others, gravely

19     disabled, in order to renew PC 2602 order against Pl., yet Def. failed to carry out medical

20     orders for psychotropic medical, continued to create grossly inadequate psychiatric care for Pl.

21     that has been based on severe punishment rather than treatment. Def. knew adequate prison

22     mental health care administration of psychotropic medications required appropriate supervision

23     and periodic evaluation. Def. refused to accept that the psychotropic medication Pl. received

24     gave side effects. Def. chose to ignore the doctor's orders, petition, and Pl. was forced to

25     continue the prescriptions or be cell extracted. Def. refused to treat Pl. for the doctors' orders

26     by a CDCR petition administrative judge and Pl. suffered unnecessary, wanton infliction of

27     pain and Pl. suffered injuries on a daily basis, sometimes sitting in puddles of blood with cut

28     wounds everywhere on arms, legs, feet, untreated. Def.'s actions were grossly inadequate

                                               22                    *OSUNA V. CAMPBELL, ET AL*

1    psychiatric care and violated Pl.'s Eight Amdt. rights.

2    00. The actions and omissions of Def. C. Soares, in creating unsafe conditions of confinement, in

3    making decisions against Pl., putting Pl. in substantial harm to his health and safety and not

4    taking action when being put on notice that Pl. had two broken windows, and was cut up by

5    the glass, and was having mental health symptoms from his mental illnesses where Pl. would

6    self-harm, Def. chose to keep Pl. in extreme isolative conditions of confinement, separated

7    from ordinary care of others to exasperate Pl.'s dangerous conditions due to mental illnesses

8    symptoms. Def. on multiple occasions and meetings when Pl.'s level of care was raised for Pl.

9    to be shipped out, Def. had another meeting, separately, and ordered that Pl. was excluded

10    from higher levels of care and was not allowed. Def. on multiple occasions, when overturning

11    transfers, stated Pl. was excluded. Pl. was informed by his clinician and Treatment Team that

12    Def. had it in file that Pl. was not allowed to access treatment programs. Def. expressed,

13    agreed that Pl. was evil and evil cannot be cured and that Pl. should be punished for his

14    crimes. When Def. was put on notice of Pl.'s injuries, Def. ordered Pl. to stay in that mental

15    health unit cell and Pl. continued to suffer injuries after Def.'s order. Def.'s actions resulted in

16    Pl. to further receive deep cut wounds, shooting pains, numbness, side effects and symptoms

17    untreated, left with the two broken windows, falling on his head with seizures going

18    untreated, and other side effects. Pl. suffered day-to-day for 4 months and further

19    decompensated. Def. admitted Pl. was self-harming daily and decompensating, stating Pl. was

20    a danger to self/others, gravely disabled, in order to renew PC 2602 order against Pl., yet Def.

21    failed to carry out medical orders for psychotropic medical, continued to create grossly

22    inadequate psychiatric care for Pl. that has been based on severe punishment rather than

23    treatment. Def. knew adequate prison mental health care administration of psychotropic

24    medications required appropriate supervision and periodic evaluation. Def. refused to accept

25    that the psychotropic medication Pl. received gave side effects. Def. chose to ignore the

26    doctor's orders, petition, and Pl. was forced to continue the prescriptions or be cell extracted.

27    Def. refused to treat Pl. for the doctors' orders by a CDCR petition administrative judge and

28    Pl. suffered unnecessary, wanton infliction of pain and Pl. suffered injuries on a daily basis,

23                                    *OSUNA V. CAMPBELL, ET AL*

1    sometimes sitting in puddles of blood with cut wounds everywhere on arms, legs, feet,

2    untreated. Def.'s actions were grossly inadequate psychiatric care and violated Pl.'s Eight

3    Amdt. rights.

4    01. The actions and omissions of Def. M. Whittaker, in creating unsafe conditions of

5    confinement, in making decisions against Pl., putting Pl. in substantial harm to his health and

6    safety and not taking action when being put on notice that Pl. had two broken windows, and

7    was cut up by the glass, and was having mental health symptoms from his mental illnesses

8    where Pl. would self-harm, Def. chose to keep Pl. in extreme isolative conditions of

9    confinement, separated from ordinary care of others to exasperate Pl.'s dangerous conditions

10    due to mental illnesses symptoms. Def. on multiple occasions and meetings when Pl.'s level

11    of care was raised for Pl. to be shipped out, Def. had another meeting, separately, and ordered

12    that Pl. was excluded from higher levels of care and was not allowed. Def. on multiple

13    occasions, when overturning transfers, stated Pl. was excluded. Pl. was informed by his

14    clinician and Treatment Team that Def. had it in file that Pl. was not allowed to access

15    treatment programs. Def. expressed, agreed that Pl. was evil and evil cannot be cured and that

16    Pl. should be punished for his crimes. When Def. was put on notice of Pl.'s injuries, Def.

17    ordered Pl. to stay in that mental health unit cell and Pl. continued to suffer injuries after

18    Def.'s order. Def.'s actions resulted in Pl. to further receive deep cut wounds, shooting pains,

19    numbness, side effects and symptoms untreated, left with the two broken windows, falling on

20    his head with seizures going untreated, and other side effects. Pl. suffered day-to-day for 4

21    months and further decompensated. Def. admitted Pl. was self-harming daily and

22    decompensating, stating Pl. was a danger to self/others, gravely disabled, in order to renew

23    PC 2602 order against Pl., yet Def. failed to carry out medical orders for psychotropic

24    medical, continued to create grossly inadequate psychiatric care for Pl. that has been based on

25    severe punishment rather than treatment. Def. knew adequate prison mental health care

26    administration of psychotropic medications required appropriate supervision and periodic

27    evaluation. Def. refused to accept that the psychotropic medication Pl. received gave side

28    effects. Def. chose to ignore the doctor's orders, petition, and Pl. was forced to continue the

24                                        *OSUNA V. CAMPBELL, ET AL*

1    prescriptions or be cell extracted. Def. refused to treat Pl. for the doctors' orders by a CDCR

2    petition administrative judge and Pl. suffered unnecessary, wanton infliction of pain and Pl.

3    suffered injuries on a daily basis, sometimes sitting in puddles of blood with cut wounds

4    everywhere on arms, legs, feet, untreated. Def.'s actions were grossly inadequate psychiatric

5    care and violated Pl.'s Eight Amdt. rights.

6                                      **PRAYER FOR RELIEF**

7    WHEREFORE, Pl. respectfully requests that the Court grant the following relief:

8    **A. Issue declaratory judgement statements;**

9    **B. Issue compensatory damages:**

10    a.   $ 800,000 weekly for the four months Pl. was left untreated with known hazardous/unsafe

11         conditions of confinement, and Pl.'s permanent disfigurement, and nerve damage, and pain.

12    b.   $ 250,000 per Def. found to have acted in deliberate indifference/in negligence of their

13         mandatory duties.

14    c.   For all punitive damages in an amount appropriate to punish the Def. and make an example

15         of the Def. to the community.

16    d.   For any additional general and or specific, consequential and or incidental damages in an

17         amount to be proven at trial.

18    e.   For all nominal damages.

19    f.   For all interests, where/as permitted by law.

20    **C. Issue injunction orders;**

21    **D. GRANT any such other relief as may appear that Pl. is entitled.**

22                                   **DEMAND FOR JURY TRIAL**

23    Pl. demands a trial by jury on all issues triable by jury.

24    Respectfully submitted on June 01, 2025,

25    

26    

27    p.p. Jamie Osuna, CDCR # BD0868

28

*OSUNA V. CAMPBELL, ET AL*

Notice to Magistrate Judge,


Plaintiff is filing his first amended complaint for 1:24-cv-01156-JLT-EPG under FRCP 15a.
Plaintiff recently found defects and mistakes in his original complaint from when Plaintiff was
having his complaint transcribed to type 12 font due to the 25-page limit from a non-e-filed
complaint. Plaintiff had many defendants and had exceeded the 25-page limit so that when
Plaintiff was transcribing the handwritten to type, words and writing were shortened, abbreviated
that Plaintiff found now and which oversight meant that some were shortened and words used
that may not have meant the same meaning. Although Pl.'s factual allegation is in great detail of
the physical injuries and the serious risk and harm that defendants knew of and where inference
could be drawn of serious risk of harm to Plaintiff's health and safety, the mental health
defendants excluded Plaintiff from treatment programs and ordered him to remain in the cell, and
so forth, and due to that 25-page limit, Plaintiff had to choose to shorten the counts and name all
defendants or to do 25-pages and keep defendants out of Pl.'s original complaint. Plaintiff tried
to get as close to 25-pages as possible. Plaintiff apologizes to the Magistrate Judge for the last
objection and Plaintiff wishes the Magistrate Judge to understand and allow the Plaintiff to
exercise his right under Rule 15a. Plaintiff has not engaged in an undue delay nor in bad faith
that would fail to save a complaint from dismissal because to fix Plaintiff's deficiencies and
mistakes would help the outcome of the complaint.


Respectfully submitted on June 01, 2025,

p.p. Jamie Osuna, CDCR # BD0868

RECEIVED

JUN 04 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____DEPUTY CLERK